David P. Schafer (TX SBN/ 00797865)
Brian J. Trenz (TX SBN/24067911)
**Law Offices of David P. Schafer**
2139 N.W. Military HWY, Suite 200
San Antonio, TX 78213
(210) 348-0500 phone
(210) 348-0520 fax

Samuel W. Eastman (TX SBN/24072438)
Samuel M. Meyler (WA SBN/39471)
**Eastman, Libersat & Meyler, PC**
1706 E. Sixth Street
Austin, Texas 78702
(844) 466-7326
(512) 879-1861

Attorneys for Plaintiffs, Jason Gerlach and Manuel Mayoral

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

### AUSTIN DIVISION

| | |
|---|---|
| JASON GERLACH and MANUEL MAYORAL, on behalf of themselves and all others similarly situated, | CASE NO. 1:16-cv-00860 |
| Plaintiffs, | CLASS ACTION |
| vs. | Complaint for Damages and Injunctive Relief Pursuant To The Telephone Consumer Protection Act, 47 U.S.C § 227 *et seq.* |
| CONN APPLIANCES, INC D/B/A CONN'S, CONN'S, Inc. and CONN CREDIT CORPORATION, INC. | *Jury Trial Demanded* |
| Defendants. | |

## INTRODUCTION

1.      Jason Gerlach and Manuel Mayoral ("Plaintiffs") bring this class action for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendants, CONN APPLIANCES, INC. D/B/A CONN'S,

**Class Action Complaint for Damages**

CONN'S, Inc., and CONN CREDIT CORPORATION, INC. (hereinafter collectively referred to as "CONN'S") and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, assigns, and/or related entities, in negligently, and/or willfully, contacting Plaintiffs on Plaintiffs' cellular telephones without their prior express consent, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, ("TCPA").   Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## JURISDICTION AND VENUE

2.      Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) of the Class Action Fairness Act ("CAFA") because Plaintiffs allege a national class, which will result in at least one class member belonging to a different state than that of Defendants. Plaintiffs seek up to $1,500.00 (one-thousand-five-hundred dollars) in damages for each call in violation of the TCPA, which, when aggregated among a proposed class numbering in the thousands, or more, exceeds the $5,000,000.00 (five-million dollars) threshold for federal court jurisdiction under CAFA.   Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

3.      Venue is proper in the United States District Court for the Western District of Texas, Austin Division pursuant to 18 U.S.C. § 1391(b)(c) and § 1441(a) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced, and because Defendants' contacts with this district are sufficient to subject Defendants to personal jurisdiction. On information and belief, Defendants have made the same calls complained of by Plaintiffs within this judicial district, such that some of Defendants' acts in making such collection calls have occurred within this district.

## PARTIES

4.      Plaintiff, JASON GERLACH ("Plaintiff Gerlach"), is, and at all times mentioned herein was, a citizen and resident of the State of Texas who resides in Devine, Texas.

**Class Action Complaint for Damages**

5.      Plaintiff, MANUEL MAYORAL ("Plaintiff Mayoral"), is, and at all times mentioned herein was, a citizen and resident of the State of Texas who resides in Austin, Texas.

6.      Plaintiffs are informed and believe, and thereon allege, that Defendants, CONN'S, at all times mentioned herein were, Corporations founded, whose primary corporate offices are located at 3295 College Street, Beaumont, Texas 77701 making the Defendants citizens of Texas for diversity purposes.  Plaintiffs allege that at all times relevant herein Defendants conducted business in the State of Texas and in the County of Travis, and within this judicial district.  Defendants attempt to collect debts owed to them by, among other means, making calls to cellular phones owned by debtors' relatives, references, and third-parties believed to be debtors or debtors' contact points.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. § 227

7.      In 1991, Congress enacted the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA),[1] in response to a growing number of consumer complaints regarding certain telemarketing practices.

8.      The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers."  Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.[2]

9.      According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA).  The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*
[2] 47 U.S.C. § 227(b)(1)(A)(iii).

**Class Action Complaint for Damages**

customers are charged for incoming calls whether they pay in advance or after the minutes are used.[3]

10.     On January 4, 2008, the FCC released a Declaratory Ruling wherein it confirmed that autodialed and/or prerecorded message calls to a wireless number by a creditor (or on behalf of a creditor) are permitted only if the calls are made with the "prior express consent" of the called party.[4]   The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."[5]

## BACKGROUND FACTS AS TO DEFENDANTS, CONN'S

11.     Defendants, CONN'S are, and at all times mentioned herein were, entities that meets the definition of "person," as defined by 47 U.S.C. § 153 (32).

12.     At all times relevant Defendants conducted business in the State of Texas and in the County of Travis, within this judicial district.

13.     Defendants, CONN'S, tout themselves collectively as a specialty retailer currently operating in approximately 100 retail locations in Arizona, Colorado, Louisiana, Mississippi, Nevada, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.  CONN'S also states that it provides flexible in-house credit options for its customers.[6]

14.     CONN'S, under the name CONN, is a publicly traded company whose stock is registered and traded on the NASDAQ Global Select Market.

---

[3] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).
[4] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("*FCC Declaratory Ruling*"), 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (2008).
[5] *FCC Declaratory Ruling*, 23 F.C.C.R. at 564-65 (¶ 10).
[6] Found at http://ir.conns.com/, last visited on September 11, 2015.

**Class Action Complaint for Damages**

15.     Defendants operate under the assumed business names "Conn's" and "Conn's HomePlus" which are trademarks owned by CONN'S.   CONN'S also owns the trademarks "YES Money" and "YE$ Money."

16.     Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, CONN'S is required to prepare annual reports ("Form 10-K") and file each Form 10-K with the United States Securities Exchange Commission ("SEC").

17.     CONN'S prepares and files a Form 10-K with the SEC annually and each Form 10-K, and all amendments (if applicable), that CONN'S has prepared and submitted to the SEC can be accessed and viewed through the SEC website.[7]

18.     Each Form 10-K prepared by CONN'S and all amendments (if applicable) from 2008 to 2015 can be accessed and viewed on CONN's website.[8]

19.     Each Form 10-K prepared by CONN'S are executed by at least a majority of the members of the Board of Directors of CONN'S, on behalf of CONN'S.

20.     Upon information and belief, execution of a Form 10-K, or an amendment to Form 10-K (if applicable), by a member of the Board of Directors of CONN'S is a representation by the executing member that the information and data disclosed and presented therein is true and accurate.

21.     In its Form 10-K for the fiscal year ended January 31, 2015, CONN'S states each of the following:

        a)      "Unless the context otherwise indicates, references to 'Conn's,' the 'Company,' 'we,' 'us,' and 'our' refer to the consolidated business operations of Conn's, Inc. and its wholly-owned subsidiaries."

        b)      "Conn's is a leading specialty retailer that offers a broad selection of quality, branded durable consumer goods and related

---

[7] http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001223389&type=10-K&dateb=&owner=exclude&count=40
[8] http://ir.conns.com/annual-proxy.cfm

**Class Action Complaint for Damages**

services in addition to a proprietary credit solution for its core credit constrained consumers."

c)      "We operate two reportable segments: retail and credit."

d)      "A significant portion of our customer credit portfolio is due from customers that are considered higher-risk, subprime borrowers."

e)      "A large portion of our credit portfolio is to customers considered to be sub-prime borrowers, who have limited credit history, low income or past credit problems. Entering into credit arrangements with such customers entail a higher risk of customer default, higher delinquency rates and higher losses than extending credit to more creditworthy customers. While we believe that our pricing and the underwriting criteria and collection methods we employ enable us to manage the higher risks inherent in issuing credit with sub-prime customers, no assurance can be given that such pricing, criteria and methods will afford adequate protection against such risks. We have experienced volatility in delinquency and charge-off rates on our credit contracts. Payments on some of our credit accounts become delinquent from time to time, and some accounts end up in default, due to several factors, such as general and local economic conditions, including the impact of rising interest rates and unemployment rates. As we continue to expand into new markets, we will obtain new credit accounts that may present a higher risk than our existing credit accounts since new credit customers do not have an established credit history with us."

f)      "Our liquidity position and profitability are heavily dependent on our ability to collect our customer receivables. If our customer receivables portfolio were to substantially deteriorate, the liquidity available to us would most likely be reduced due to the challenges of complying with the covenants and borrowing base calculations under our revolving credit facility and our earnings may decline due to higher provisions for bad debt expense, higher servicing costs, higher net charge-off rates and lower interest and fee income."

g)      "Our ability to operate our business from day to day, in particular our ability to manage our credit operations and inventory levels, largely depends on the efficient operation of our computer hardware and software systems."

## FACTS SURROUNDING CONN'S USE OF AN ATDS

22.      Texas Utility Code § 55.121 defines an "automatic dial announcing device"

("ADAD") as, "equipment used for telephone solicitation or collection that can:

Class Action Complaint for Damages

"(A) store telephone numbers to be called or produce numbers to be called through use of a random or sequential number generator; and

"(B) convey, alone or in conjunction with other equipment, a prerecorded or synthesized voice message to the number called without the use of a live operator."

23.    Texas Utility Code § 55.130(a) states, "A person may not use an automated dial announcing device without a permit issued by the commission."

24.    The definition of an ADAD under Texas Utility Code § 55.121 is coextensive with the definition of an ATDS under 47 U.S.C. § 227(a)(1).

25.    Since at least 2006, Defendants, or their predecessors, have maintained a permit to use an ADAD from the Public Utility Commission of Texas.

26.    In its Form 10-K for the fiscal year ended January 31, 2008, CONN'S stated:

a)     "We maintain a predictive dialer system and letter campaign that helps us contact between 25,000 and 30,000 delinquent customers daily. We also maintain an experienced skip-trace department that utilizes current technology to locate customers who have moved and left no forwarding address."

b)     "We employ Nortel telephone switches and state of the art Avaya predictive dialers, as well as a redundant data network and cable plant, to improve the efficiency of our collection and overall corporate communication efforts."

27.    Attached hereto as **Exhibit 1** are true and accurate copies of CONN'S 2008 ADAD Registrations.

28.    The Avaya ADAD units identified in **Exhibit 1** are the same Avaya predictive dialers referenced in CONN's Form 10-K for the fiscal year ended January 31, 2008.

29.    In its Form 10-K for the fiscal year ended January 31, 2009, CONN'S stated:

a)     "We maintain a predictive dialer system and letter campaign that helps us contact between 30,000 and 35,000 delinquent customers daily. We also maintain an experienced skip-trace department that utilizes current technology to locate customers who have moved and left no forwarding address."

**Class Action Complaint for Damages**

b)      "We employ Nortel telephone switches and state of the art Avaya predictive dialers, as well as a redundant data network and cable plant, to improve the efficiency of our collection and overall corporate communication efforts."

30.      Attached hereto as **Exhibit 2** are true and accurate copies of CONN'S 2009 ADAD Registrations.

31.      The Avaya ADADs identified in **Exhibit 2** are the same Avaya predictive dialers referenced in CONN's Form 10-K for the fiscal year ended January 31, 2009.

32.      It its Form 10-K for the fiscal year ended January 31, 2010, CONN'S stated:

a)      "We maintain a predictive dialer system, including virtual collection systems, and letter campaign that helps us contact over 35,000 delinquent customers daily.  We also maintain an experienced skip-trace department that utilizes current technology to locate customers who have moved and left no forwarding address."

b)      "We employ Nortel telephone switches and state of the art Avaya predictive dialers, as well as a redundant data network and cable plant, to improve the efficiency of our collection and overall corporate communication efforts."

33.      Attached hereto as **Exhibit 3** are true and accurate copies of CONN'S 2010 ADAD Registrations.

34.      The Avaya ADADs identified in **Exhibit 3** are the same Avaya predictive dialers referenced in CONN'S Form 10-K for the fiscal year ended January 31, 2010.

35.      In 2011, CONN'S purchased and implemented predictive dialer equipment and services from Noble Systems Corporation.

36.      In its Form 10-K for the fiscal year ended January 31, 2011, CONN'S stated:

a)      "We employ an intensive credit collection strategy that includes dialer-based calls, virtual calling and messaging systems..."

b)      "We maintain a predictive dialer system, including virtual collection systems, and letter campaign that helps us contact and speak to over 26,000 delinquent customers daily.  We also maintain an experienced skip-trace department that utilizes current technology to locate customers who have moved and left no forwarding address."

**Class Action Complaint for Damages**

c)      "We employ Nortel telephone switches and Avaya predictive dialers, as well as a redundant data network and cable plant, to improve the efficiency of our collection and overall corporate communication efforts."

37.     Attached hereto as **Exhibit 4** are true and accurate copies of CONN'S 2011 ADAD Registrations.

38.     The Avaya ADADs identified in **Exhibit 4** are the same Avaya predictive dialers referenced in CONN'S Form 10-K for the fiscal year ended January 31, 2011.

39.     CONN'S registered and used the ADADs identified in **Exhibit 4** during 2011 in connection with outbound calling.

40.     In its Form 10-K for the fiscal year ended January 31, 2012, CONN'S stated:

a)      "We employ an intensive credit collection strategy that includes dialer-based calls, virtual calling and messaging systems..."

b)      "In addition to our underwriting personnel, as of January 31, 2012, we employed approximately 360 people in our collections department who service 100% of our active customer credit portfolio…We employ an intensive credit collection strategy that includes dialer-based calls, virtual calling and messaging systems..."

c)      "We maintain a predictive dialer system, including virtual collection systems, and letter campaigns that help us contact and speak to customers daily.  We also maintain an experienced skip-trace department that utilizes current technology to locate customers who have moved and left no forwarding address."

d)      "We employ Nortel telephone switches and a Noble Systems hosted predictive dialer, as well as a redundant data network and cable plant, to improve the efficiency of our collection and overall corporate communication efforts."

41.     Attached hereto as **Exhibit 5** are true and accurate copies of CONN'S 2012 ADAD Registrations.

42.     CONN'S registered and used the ADADs identified in **Exhibit 5** during 2012 in connection with outbound calling.

43.     In its Form 10-K for the fiscal year ended January 31, 2013, CONN'S stated:

9

**Class Action Complaint for Damages**

a)   "...as of January 31, 2013, we employed approximately 325 people in our collections department who service our active customer credit portfolio. We also utilize a third-party collection agency to service a portion of our active portfolio...We employ an intensive credit collection strategy that includes dialer-based calls, virtual calling and messaging systems, inside collectors that contact borrowers at phone numbers they provide..."

b)   "We maintain a predictive dialer system, including virtual collection systems, and letter campaigns that help us contact and speak to customers daily. We also maintain an experienced skip-trace department that utilizes current technology to locate customers who have moved and left no forwarding address."

44.   Attached hereto as **Exhibit 6** are true and accurate copies of CONN'S 2013 ADAD Registrations.

45.   CONN'S registered and used the ADADs identified in **Exhibit 6** during 2013 in connection with outbound calling.

46.   In its Form 10-K for the fiscal year ended January 31, 2014, CONN'S stated:

a)   "...as of January 31, 2014, we employed approximately 530 people in our collections department who service our active customer credit portfolio."

b)   "We employ an intensive credit collection strategy that includes dialer-based calls, virtual calling and messaging systems..."

c)   "We maintain a dialer system, including virtual collection systems, and letter campaigns that help us contact and speak to customers daily. We also maintain skip-tracing processes that utilize current technology to locate contact information for customers who have moved and left no contact information."

47.   Attached hereto as **Exhibit 7** are true and accurate copies of Conn's 2014 ADAD Registrations.

48.   Conn's registered its Noble Systems Corporation equipment for the first time in 2014

49.   CONN'S registered and used the ADADs identified in **Exhibit 7** during 2014 in connection with outbound calling.

**Class Action Complaint for Damages**

50.     In its Form 10-K for the fiscal year ended January 31, 2015, CONN'S stated:

    a)      "We employed over 700 individuals in our collections department who service our active customer credit portfolio. We also utilize collection agencies to service portions of our active and charged-off portfolio, which provide approximately 130 additional agents located in Phoenix, Arizona."

    b)      "We employ a credit collection strategy that includes dialer-based calls, virtual calling and messaging systems, inside collectors that contact borrowers, collection letters, e-mails, and text messages, a legal staff that processes claims and attends bankruptcy hearings, and voluntary repossession. We also utilize current technologies that assist us in locating contact information for customers who have moved and left no contact information."

51.     Attached hereto as **Exhibit 8** are true and accurate copies of CONN'S 2015 ADAD Registrations.

52.     CONN'S registered and used the ADADs identified in **Exhibit 8** during 2015 in connection with outbound calling.

53.     In its Form 10-K for the fiscal year ended January 31, 2016, CONN'S stated:

    a)      "Our collection activities involve a combination of efforts that take place in our Beaumont and San Antonio, Texas collection centers. We employed approximately 830 full time and part time individual collectors and support personnel who service our active customer credit portfolio. We also utilize collection agencies to service portions of our active and charged-off portfolio, which provide approximately 350 additional agents located in Phoenix, Arizona."

    b)      "We employ a credit collection strategy that includes dialer-based calls, virtual calling and messaging systems, inside collectors that contact borrowers, collection letters, e-mails, and text messages, a legal staff that processes claims and attends bankruptcy hearings, and voluntary repossession.  We also utilize current technologies that assist us in locating contact information for customers who have moved and left no contact information."

54.     Attached hereto as **Exhibit 9** are true and accurate copies of CONN'S 2016 ADAD Registrations.

55.     CONN'S registered and has used the ADADs identified in **Exhibit 9** during 2016 in connection with outbound calling.

11

56.     Given the number of delinquent customers CONN'S contacts daily and the number of individuals employed in CONN'S collections department, it would be impracticable for CONN'S representatives to manually dial the telephone numbers of customers that CONN'S was attempting to reach.

**PERTINENT FACTS REGARDING CALLS MADE TO PLATINIFF GERLACH**

57.     Beginning no later than January 2013, and continuing through approximately July of 2015, Defendants, CONN'S, called Plaintiff Gerlach, on his cellular telephone number, ending in "4662", in an attempt to collect a debt.  Plaintiff Gerlach received multiple calls a day from CONN'S and has, at the time of filing this complaint, received more than twenty debt collection calls from CONN'S.

58.     Plaintiff Gerlach did not provide Defendants with his cellular telephone number.  Plaintiff Gerlach did not give Defendants prior express consent to call him on his cellular telephone with the use of an autodialer and/or prerecorded message, pursuant to 47 U.S.C. § 227 (b)(1)(A).

59.     Based upon information and belief, CONN'S attempts to collect money that it is owed on delinquent credit accounts and in the process, calls cellular telephone numbers where it lacks express written consent.

60.     On information and belief, Defendants may have obtained Plaintiff Gerlach's cellular telephone number from a third party, or by "skip tracing" or "trapping" the number (i.e., making a record of his cell phone number using caller identification technology) but did not receive that number from Plaintiff Gerlach.  Plaintiff Gerlach is not a CONN'S customer and did not agree to an extension of credit from CONN'S.

61.     Notwithstanding the fact that Plaintiff Gerlach did not provide Defendants with his cellular telephone number at any time, Defendants, or their agents, have called Plaintiff Gerlach on his cellular telephone via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(1).

62.     Said "ATDS" calls were made from approximately June of 2013 to approximately July of 2015, all in violation of the TCPA.

12

63.     The telephone number Defendants and/or their agents called is assigned to a cellular telephone service for which Plaintiff Gerlach incurs a charge for incoming calls pursuant to 47 U.S.C. § 227 (b)(1).

64.     These telephone calls constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227 (b)(1)(A)(i).

65.     These telephone calls by Defendants and/or their agents violated 47 U.S.C. § 227(b)(1).

66.     Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendants to demonstrate that Plaintiff Gerlach provided express consent within the meaning of the statute.

## FACTS CONCERNING CALLS MADE TO PLAINTIFF MAYROAL

67.     Beginning in approximately February of 2014, and continuing through approximately August of 2015, Defendants, CONN'S, called Plaintiff Mayoral, on his cellular telephone number, ending in "5893", in an attempt to collect a debt.  Plaintiff Mayoral, at the time of filing this complaint, believes that he has received more than twenty debt collection calls from CONN'S.

68.     Plaintiff Mayoral did not provide Defendants with his cellular telephone number.  Plaintiff Mayoral did not give Defendants prior express consent to call him on his cellular telephone with the use of an autodialer and/or prerecorded message, pursuant to 47 U.S.C. § 227 (b)(1)(A).

69.     Based upon the manner and method by which CONN'S contacted Plaintiff Mayoral, Plaintiff Mayoral believes that CONN'S obtained his cellular telephone number in an attempt to contact the true debtor and account holder that CONN'S was seeking.  Plaintiff Mayoral believes that his number could have been provided to CONN'S by a third-party but he did not provide his phone number to CONN'S. Plaintiff Mayoral is not a signatory or obligor on any account with CONN'S and does not owe a debt to CONN'S.

70.     Notwithstanding the fact that Plaintiff Mayroal did not provide Defendants with his cellular telephone number at any time, Defendants, or their agents, have called

13

Plaintiff Mayoral on his cellular telephone via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(1).

71.     Said "ATDS" calls were made from approximately February of 2014 to approximately August of 2015, all in violation of the TCPA.

72.     The telephone number Defendants and/or their agents called is assigned to a cellular telephone service for which Plaintiff Mayoral incurs a charge for incoming calls pursuant to 47 U.S.C. § 227 (b)(1).

73.     These telephone calls constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227 (b)(1)(A)(i).

74.     These telephone calls by Defendants and/or their agents violated 47 U.S.C. § 227(b)(1).

75.     Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendants to demonstrate that Plaintiff Mayoral provided express consent within the meaning of the statute.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated ("the Class").

*77.*     Plaintiffs represent, and are members of, the Class, consisting of:

> *All persons within the United States who received any telephone call from Defendants or their agents to said person's cellular telephone through the use of any automatic telephone dialing system in connection with Defendants' attempts to collect a debt who did not provide prior express consent to Defendants, within the four years prior to the filing of the Complaint in this action.*

78.     Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the Judge to whom this action is assigned and any member of the Judge's staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress.

**Class Action Complaint for Damages**

79.     Plaintiffs do not know the number of members in the Class, but believe the total number of class members to be in the tens of thousands, if not more.  Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of this matter.

80.     Plaintiffs and members of the Class were harmed by the acts of Defendants in, but not limited to, the following ways: Defendants, either directly or through their agents, illegally contacted Plaintiffs and the Class members via their cellular telephones by using an autodialer, thereby causing Plaintiffs and the Class members to incur certain cellular telephone charges or reduce cellular telephone time for which Plaintiffs and the Class members previously paid; by having to retrieve or administer messages left by Defendants during those illegal calls; and invading the privacy of said Plaintiffs and the Class members.  Plaintiffs and the Class members were damaged thereby.

81.     This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of the Class and it expressly is not intended to request any recovery for personal injury and claims related thereto.  Plaintiffs reserve the right to expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

82.     The joinder of the Class members is impracticable and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the Court.  The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.  The Class can be identified through Defendants' or their agents' records.

83.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.  The questions of law and fact to the Class predominate over questions that may affect individual Class members, including the following:

a)      Whether, within the four years prior to the filing of this Complaint, Defendants and/or their agents made any call (other than a call made for emergency purposes or made with the prior express consent of the called party) to a Class member using any automatic telephone dialing system to any telephone number assigned to a cellular telephone service;

**Class Action Complaint for Damages**

b)     Whether Defendants can meet its burden of showing they obtained prior express consent (i.e., consent that is clearly and unmistakably stated), during the transaction that resulted in the debt in question being owed, to make such calls;

c)     Whether Defendants' conduct was knowing and/or willful;

d)     Whether Defendants are liable for damages, and the extent of statutory damages for such violation; and

e)     Whether Defendants should be enjoined from engaging in such conduct in the future.

84.     As persons that received numerous calls using an automatic telephone dialing system, without their prior express consent, Plaintiffs are asserting claims that are typical of the Class.  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that Plaintiffs have no interests antagonistic to any member of the Class.

85.     Plaintiffs and the members of the Class have all suffered irreparable harm as a result of the Defendants' unlawful and wrongful conduct.  Absent a class action, the Class will continue to face the potential for irreparable harm.  In addition, these violations of law would be allowed to proceed without remedy and Defendants would undoubtedly continue such illegal conduct.  Because of the size of the individual Class members' claims, few Class members could afford to seek legal redress for the wrongs complained of herein.

86.     Plaintiffs have retained counsel experienced in handling class action claims and claims involving violations of the Telephone Consumer Protection Act.

87.     A class action is a superior method for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Defendants to comply with federal and Texas law.  The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims. Defendants have acted on grounds generally

16

applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT**
**47 U.S.C. § 227 ET SEQ.**

88.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

89.     The foregoing acts and omissions of Defendants constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227, *et seq.*

90.     As a result of Defendants' negligent violations of 47 U.S.C. § 227, *et seq.,* Plaintiffs and the Class are entitled to an award of $500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).  Plaintiffs and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

91.     Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**KNOWING AND/OR WILLFUL VIOLATIONS OF THE**
**TELEPHONE CONSUMER PROTECTION ACT**
**47 U.S.C. § 227 ET SEQ.**

92.     Plaintiffs incorporate by reference the above paragraphs   of this Complaint as though fully stated herein.

93.     The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227, *et seq.*

94.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227, *et seq.*, Plaintiffs and the Class are entitled to treble damages, as provided by statute, up to $1,500.00, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**Class Action Complaint for Damages**

95.     Plaintiffs and the Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

96.     Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs.

<u>**PRAYER FOR RELIEF**</u>

Wherefore, Plaintiffs respectfully request the Court grant Plaintiffs and the Class members the following relief against Defendants:

<u>**FIRST CAUSE OF ACTION FOR NEGLIGENT VIOLATION OF THE TCPA, 47 U.S.C. § 227 ET SEQ.**</u>

•     As a result of Defendants' negligent violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each Class member $500.00 (five-hundred dollars) in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

•     Pursuant to 47 U.S.C. § 227(b)(3)(A), injunctive relief prohibiting such conduct in the future.

•     An award of attorneys' fees and costs to counsel for Plaintiffs and the Class.

•     An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class.

•     Any other relief the Court may deem just and proper.

<u>**SECOND CAUSE OF ACTION FOR KNOWING AND/OR WILLFUL VIOLATION OF THE TCPA, 47 U.S.C. § 227 ET SEQ.**</u>

•     As a result of Defendants' willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each Class member treble damages, as provided by statute, up to $1,500.00 (one-thousand-five-hundred dollars)

for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

 • Pursuant to 47 U.S.C. § 227(b)(3)(A), injunctive relief prohibiting such conduct in the future.

 • An award of attorneys' fees and costs to counsel for Plaintiffs and the Class.

 • An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class.

 • Any other relief the Court may deem just and proper.

### TRIAL BY JURY

 Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury on all counts so triable.

Date: July 12, 2016

**LAW OFFICES OF DAVID P. SCHAFER**

By: */s/ Brian J. Trenz*
Brian J. Trenz
David P. Schafer
2139 N.W. Military HWY, Suite 200
San Antonio, TX 78213
(210) 348-0500 phone
(210) 348-0520 fax
**Attorneys for Plaintiffs**

**EASTMAN, LIBERSAT & MEYLER, PC**

BY: /S/ SAMUEL M. MEYLER
SAMUEL M. MEYLER
Washington State Bar No. 39471
E-mail: sam.meyler@elmlegal.com
SAMUEL W. EASTMAN
Texas State Bar No. 24072438
E-mail: sam.eastman@elmlegal.com

19

**Class Action Complaint for Damages**

1706 E. Sixth Street
Austin, TX 78702
Tel: (844) 466-7326
Fax: (512) 879-1861
**ATTORNEYS FOR PLAINTIFFS**

**Class Action Complaint for Damages**